Good morning. If it pleases the Court, my name is Richard Zaman, and I'm appearing on behalf of Ms. Weber in this Social Security Disability matter. I will keep track of my time, but I also request that I be allowed to reserve two minutes of my time for rebuttal. You may do so. Just watch the clock. I will. Thank you. The issues I wish to address in this particular argument are the ALJ's improper treatment of the treating medical source opinion of treating source Dr. Kirsten, and the treatment of Ms. Weber's medical treatment in general, and the ALJ's improper credibility analysis. What I'm arguing is that Dr. Kirsten's opinion deserves controlling weight. Ms. Weber's reported limitations are credible, and this case should be remanded for payment of benefits, which is consistent with the ALJ's statement that if he were to accept the allegations, claiming couldn't work and a disability finding would be issued. Well, now, the ALJ took into account the observations he made over in the record of her daily activities, the kinds of things she did during the day, and those seem to be in conflict with the medical testimony. Is that how you look at it? No, I don't look at that. Not at all, Judge. First, claimant doesn't have to allege total incapacity. I believe what this Court has stated is ALJ may reject plaintiff's symptom testimony if the plaintiff is able to spend a substantial part of her day performing household chores or other activities that are transferable to a work setting, but this line of reasoning has its limits. The Act does not require plaintiffs to be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication. When the ALJ listed the activities, he listed them, and this is from the decision he addressed, helping her disabled son getting dressed off to school, light housework, and per the ALJ, she gets so tired with these activities, she takes short naps in between, paying household bills, but is only able to work on them for 15 to 20 minutes at a time, which means she has to look them over and over. She sometimes forgets to put the check in the envelope. Also mentioned waters, plants, and sweeps outside about once a week, carries a single bag of groceries, single load of laundry, reads magazines, newspapers three or four times a day for short periods, does e-mails, attends Jehovah's Witness meetings about twice a week. The ALJ also mentioned that these were confirmed by the husband. But then without analysis, the judge just stated the rule and said it should be noted that the physical and mental capabilities requisite for performing many of these household tasks and social activities replicate those necessary for obtaining and maintaining employment. That's all he said. He stated the rule, and it was over. He never provided any nexus between how activities that she could do when able, getting so tired, taking naps, translates to any type of job. Again, it was a conclusory statement, and that's where it ended. Now, there's another concern that I have, and that is that in this case, there's a specific date we have to focus on. It's September 30, 2001. Correct. Now, it appears that some of the evidence in the record has to do with her conditions in 2000 and what, three? Yes. And isn't there a problem to the extent to which that relates back to September 30, 2001? The judge says it, and the ALJ, I should say, here's how he addresses it. He refers to what he says are gaps in sporadic treatment. He notes, and as I was going to refer to Dr. Kirsten, she's the treating source at Kaiser. By the time of the hearing, which was January of 2003, she had been treating the patient for eight years. There was much treatment in the beginning. Going back to 1994, you can see that in the medication record. State agency only asked as of 1996. She's mentioned in a 1995 Kaiser consult as being the one who diagnosed fibromyalgia. And you see many chart notes, and then her treatment does slow. But 96.7p, Social Security ruling 96.7p states that a judge is not supposed to take negative inference from that until he finds out the reasons. And as an example of reasons they give are sometimes there has reached a course of treatment where there's nothing more to do. A patient will see a doctor as needed for medications. A little further down the examples will say the doctor maybe hasn't informed the patient, nothing more can be done. Dr. Kirsten noted that once fibromyalgia was diagnosed, there was no more treatment modalities to try. She kept seeing the patient on an as-needed basis and continued medications. You see the medications starting from 94, when there were frequent visits, up through maybe 98, 99. And as the visits slowed down, you see the medications continuing. The ALJ found those later medications to be entirely unexplained. He didn't understand why there were continued muscle relaxants, pain medications, sleep, antidepressants, but they were prescribed all the way through. But the doctor's opinion or the doctor's reason is consistent with the rule that the ALJ should have followed, and the ALJ did not mention that at all. Well, are you saying that there is nothing in the record that would support what appears to be the ALJ's inference, that her condition at the time she testified at the hearing was worse in some way than it was at the time, the cutoff date for disability things? It may very well have been worse, but it doesn't mean it was not disabling prior to. What Dr. Kirsten said is that the client had been, or that her patient had been stable at a level of disability. Stable obviously doesn't mean improved. Stable means not getting worse, not getting any better. She's had her stabilized. And she said in her assessment, 94, worse than 95 was about the earliest date she could note some of those more severe limitations, but she remained at a level of disability all the way through. So your position then would be that regardless of what her condition was in 2003, there's substantial evidence in the record that would permit an inference as to her condition in 2001? Absolutely. There's Dr. Kirsten's chart notes. The bulk of the chart notes predate the DLI. As the doctor explained, once she reached a point where there really was nothing more to do but see the patient as needed, they diagnosed the condition. They done tests. She herself was the one that ordered the other consults. And there was nothing more to do but see her as needed and keep her on the medications just as necessary, I suppose. Also, I should point out, Dr. Kirsten's opinion is not really contradicted by any other examining or treating source. There's reference to neurological consults. Those are 1998 and 1995 ordered by Dr. Kirsten that predate the DLI by three and five years. None of them, they were ordered for specific reasons to, I'm getting down on my timer, for one was for one hand particular weakness in the right, then the left, or vice versa. And while they didn't find any neurological problems, they never said that she wasn't in as much pain as claimed. I'll stop there and reserve the rest of my time. You may do so, counsel. That's fine. We'll hear from the government. Good morning. Shea Bond on behalf of the Commissioner of Social Security. Your Honors, it was claimant's burden to prove that she was disabled before her insurance status expired on September 30th of 2001. And evidence of any kind of deterioration in her condition after this date simply was not relevant to that period of time. I think it's also important to note that the claimant had filed a prior application for benefits and the agency had denied that application back in April of 1998. So really the time period under consideration here is a smaller period of time because the ALJ, hearing the current application, did not reopen that prior denial. Is there a physician who contradicted Dr. Kirsten? I'm sorry, could you repeat that, Your Honor? Is there a physician, any physician who examined the applicant who contradicted Dr. Kirsten? There were doctors who examined the claimant during the period of time, but there is no opinion from an examining physician that specifically contradicts Dr. Kirsten's opinion. So what basis would we have to reject Dr. Kirsten, who's the only physician to have examined her and rendered an opinion? Well, under the circuit precedent, there doesn't need to be a contradicting medical opinion in order for an ALJ to reject a treating physician's opinion. There are factors that the ALJ takes into consideration when evaluating a treating physician's opinion, and in this case there were several factors that the ALJ took into consideration. We have to remember that when Dr. Kirsten issued this opinion, it was after the date last insured and was retrospective. Well, that's just the nature of any opinion. I mean, it's going to relate back to the time in question. Correct. What else, what other reason do we have to reject her opinion? Well, the ALJ specifically took into account that Dr. Kirsten, during the insured period, had only actually had office time with the claimant on very limited instances. It was maybe three or four times over, I think, approximately a two and a half year period. That's more than any other doctor had. That is true. However, that still counts as a factor in evaluating the treating physician's opinion. The regulations do Counsel, following up on Judge Silverman's question and your opposing counsel's thesis, if the claimant was established in a context of disability prior to 2001, then doesn't that explain why there are not extensive physician contacts thereafter? The physician is saying, hey, there's nothing more I can do for you. I can provide you medication. Come in when you need your prescriptions refilled. And medication is a treatment for fibromyalgia. However, Dr. Kirsten, in one of her statements, had said that, you know, I'm treating this claimant with medication and she should come back when there's exacerbations of the symptoms. Now, in the claimant's testimony, she would say that she was experiencing this very extreme fatigue, extreme pain that would require her to, at one point she testified that she had to lie down in bed for a week at a time. Now, I think if she was lying down in bed for a week at a time, that would justify going and seeking additional treatment, maybe to get adjustments in the medication or to get further testing to see if there was something else that could be causing this increase in symptoms. But there's just no record of that during the insured period of time. She went in just a few times when she did have some exacerbations, but it was very limited. But the doctor explains that by saying, I've done everything I can do for her. I mean, I can't do anything else for her. What's the point of her going back? Again, because she was alleging that she was having this increased deterioration in her physical condition during the insured period. Now... I mean, how many times does the doctor have to tell her, I'm doing everything I can do? There could have been other treatment modalities. Now, there is evidence that Dr. Kirsten had recommended an exercise program and physical therapy for the claimant, but the claimant didn't participate. There's evidence from Dr. Kirsten that the claimant wasn't walking as prescribed. She wasn't doing the aerobic activity. Dr. Kirsten said that she could do up to a medium exertion. So does that show that she doesn't have fibromyalgia, or does that show that she's not compliant? It shows that she wasn't compliant with her treatment, which is another factor the ALJ took into consideration when evaluating this claim. Is there anything in the record from Dr. Kirsten or anyone else that suggests that if the claimant had walked as suggested and did aerobics or whatever, that that would have made her capable of working in the marketplace? There's no specific opinion stating that if she were to exercise, she'd be able to work. But the fact that the claimant wasn't following prescribed treatment, that was limiting her ability to function. And that was a self-limiting decision. If she's not following the prescribed treatment, how is she going to get better? How is she going to, you know, better herself? And it's just in the record here, she wasn't even doing that. She wasn't even following her doctor's prescription for exercise. Is there some explanation for why she was not independently examined by another physician? Do you mean a DDS physician, an agency physician, or do you mean just kind of any other Kaiser doctor? No, I mean by the agency. I don't know why there was no consult in this case. That's puzzling because a lot of these cases, you know, you have the treating physician and then there's another doctor who expresses a contrary opinion. In this case, there's really just the one opinion. There were DDS reviewing physician opinions. There also was another examining physician from Kaiser. Now he did not, Dr. McCarthy, he did not specifically issue any kind of treatment. And he also recommended that the claimant for treatment just perform aerobic activity as a treatment. And he also recommended aggressive psychiatric treatment, too? He did. And again, the claimant didn't pursue that. There's no mention of her pursuing any kind of mental therapy, in that sense, counseling, until after the day last insured expired. But getting back to your question, Your Honor, about a contrary medical opinion, there were the DDS reviewing physicians who reviewed the record, both in 1998 and in 2002, and had determined that the claimant could perform, I think, at a minimum of a light-level exertional activity. But did any of these opinions refer to Dr. Kirsten's observations? For her opinion, no, because her opinion was issued after the DDS physicians had reviewed the record. Wouldn't that, under circuit precedent, impose a duty on the ALJ to develop the record by specifically requesting of the government, of the doctors performing the government-requested evaluations that they comment on Dr. Kirsten's evaluation? If the duty to develop the record is triggered when the record is ambiguous or there needs to be further development. And I'd say in this ---- Aren't you arguing that there's an ambiguity between the checkmark reports from the examining doctors and Dr. Kirsten that could have been cleared up by clarification? I wouldn't call it an ambiguity. I would just say it was a conflict. And if there's a conflict, in the record, it's the ALJ's sole responsibility to resolve that conflict. Now, just because there's a conflict in the record, that does not automatically mean that the ALJ needs to go back and seek further clarification from any particular doctor. It's the ALJ's role to be the arbiter of that evidence. Now in this case, everything that was in the record that the ALJ needed to evaluate the Kirsten's treatment records, which were very sparse, you had, of course, Dr. Kirsten's subsequent opinion. The ALJ very well could go and look at Dr. Kirsten's records to assess the validity of that opinion. He also had the examining treatment records from Dr. Meister, who did the psych exam, and Dr. McCarthy, who did the neurological exam. Can I ask you one more question before you run out of time? If we were to agree with counsel that the ALJ should not have rejected Dr. Kirsten, what do we do? Do we send it back for an award of benefits, or would there be any reason to have any further proceedings, or is that just the ballgame? If your honors did decide that this case was not supported by substantial evidence and needed to go back, the commissioner would state that we would need a remand for further proceedings, that the award of benefits would not be appropriate in this case. But further proceedings. Perhaps then for maybe a medical expert to review the record and offer an opinion. You had your day in court and lost. Why do you get another day in court? Because to remand for an award of benefits is an extraordinary remedy, and it should be applied very rarely, and this case just does not simply satisfy that burden. Thank you, counselor. Your time has expired. Mr. Zeman, you have some reserved time. Yes. I would first like to point out, in terms of the state agency's non-examining physicians, the ALJ himself rejected both of their opinions. They had, at first in the 98 claim, came up with a light RFC, which was 10 and 20 pounds lifting, but stand walked six of eight hours, based on fibromyalgia. In 02, it wasn't fibromyalgia, it was arthralgias, and they put it up to medium. Same stand walk, but now lift, carry 25 and 50 pounds. And the judge disagreed with the standing and walk. He said that was not reasonable. So the ALJ considered those and didn't even agree with them. And again, the other So you would say that it would not be possible for us to infer from this record that the ALJ relied on those reports in rejecting Dr. Kirsten? No. No, the ALJ rejected those reports. So he said they were unreasonable. So if he rejected Dr. Kirsten, it had to be for some other reason. He rejected, as I said, for what he claimed was the sparse treatment. I'd like to address the area of that insured period. The relevant period is the issue where a claimant has to prove they're disabled. And it also addresses when benefits or payments are eligible. But it doesn't limit the period of time you consider records. Someone could have fallen off a ladder and broken their back six years ago and just never saw benefits. You don't not look at those records to see if they're disabled now. But not now. It's September 30, 01. Well, that's what I meant. But what counsel was saying was sparse period leading up to 01 because of the judge not reopening the 98 claim. But all those records, you still look at them to get the longitudinal picture. They're added to the record for a reason. They're there for the judge to consider for the full picture. And that's when the bulk of the treatment was. That's when the doctor decided there was nothing more I could do and when disability was established. Physical therapy, she testified it was in Vallejo during rush hour, her appointment, and it was too painful for her to do the drive over. And with that, that's the end of my time. Can I ask one question? Certainly. Is there any agency estoppel effect to the 1998 rejection of denial of service? In other words, as to her condition at that time? Well, I would say no. Did she appeal that? No, she did not appeal. But the judge could have reopened. The OJ could have reopened. And the reason in that period would have been new material evidence. And Dr. Kersen's letter would allow new material evidence to reconsider that period, because it was addressing that period and further. So while we're not specifically asking for that, we would be happy with the remand for payment on the 02, that 98 isn't without consideration if it's sent back for further action. Thank you, counsel. The case just argued will be submitted for decision. And we will hear argument next in Goldsmith versus Scribner.
judges: O'scannlain, Silverman, Singleton